UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHNNY W. GREEN, JR.,

        Plaintiff,

    v.

ESTES EXPRESS LINES,

        Defendant.

Civil Action No: 3:13-cv-30126-KPN

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### (Fed R. Civ. P. 56)

Defendant Estes Express Lines, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby respectfully moves for summary judgment dismissing all of Plaintiff's claims and causes of action with prejudice on the grounds that there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law. In support of this Motion and in accordance with Local Rule 56.1, Defendant refers to the record in this action, including the pleadings, the deposition testimony of the Plaintiff, Exhibit A hereto, the affidavits of Renee Bloom and Dan O'Connor of Estes, Exhibits B and C respectively hereto, the statement of undisputed facts set forth herein with additional supporting exhibits as described below in further detail, and the accompanying Memorandum in Support of Defendant's Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS OF RECORD

Pursuant to Local Rule 56.1, Defendant Estes Express Lines submits the following statement of the undisputed material facts of records as to which Estes contends there is no genuine issue to be tried in this action:

A.   **Relevant Background Information**

1. Estes Express Lines is in the freight transportation (trucking) business and operates its trucking activities from various facilities, known as terminals, located throughout the Eastern United States (Exhibit B, ¶2).[1]  One such facility is located in Chicopee, Massachusetts *(Id.*; A115)[2].

2. The Terminal Manager for the Chicopee facility was and is Dan O'Connor (Exhibit C, ¶1). The Dispatch Supervisor for the local truck drivers was and is Bob Senk (Exhibit C, ¶1). Mark Cato was a Dock Supervisor *(Id.)*. Renee Bloom was the Regional Human Resources Manager for the region which encompasses the Chicopee terminal (Exhibit B, ¶1). Brenda Gerczak is the Assistant Vice President of Human Resources for Estes whose office is located at the corporate headquarters in Richmond, Virginia (Exhibit B, ¶3).

3. Plaintiff worked for Estes a little over five years (A30). He originally applied for employment with Estes on October 20, 2004 (A44-45). He began his employment on November 8, 2004 *(Id.)*. He was hired as a full-time pickup and delivery (P&D) driver *(Id.)*. He remained in the P&D driver job for the next three years, until the recession hit and Estes suffered a reduction in force *(Id.)*. The company made efforts to keep him employed by putting him on a hub run and letting him do some jockey (moving trailers around the terminal yard) work *(Id.)*. He returned to his P&D job on May 31, 2010 (*Id.*).

4. Plaintiff was terminated on June 22, 2010 (A45-46).  He was discharged for

---

[1] The affidavits of Renee Bloom and Dan O'Connor are found at Exhibits B and C respectively hereto.

[2] Cited excerpts from the deposition of Plaintiff Johnny Green are found at Exhibit A hereto and are hereafter cited as "(A ____)". The numbers in parentheses refer to the supporting pages of his sworn testimony. Plaintiff swore in his deposition that his testimony was the absolute truth. He did not misrepresent or hide information. Significantly, he testified that with respect to the cited excerpts to this memorandum, nothing in the world could cause him to change his testimony because he understood the questions and answered them truthfully, accurately and completely (A205-206).

insubordination and failure to follow directives which he admits to be automatic termination offenses under Estes' policies and practices *(Id.)*. Plaintiff acknowledged in his sworn testimony that he did indeed refuse to sign an employee acknowledgement form for a distributed policy manual (A46). He admits that he was directed to sign the form and that his failure to do so was a termination offense under Estes' policies *(Id.)*. According to the Plaintiff, this was the "true and real reason" he was terminated by Estes *(Id.)*.

5. According to Plaintiff, Estes was a good place to work (A115). It had good operations, policies, pay and benefits *(Id.)*. He worked with good people and good managers at the Chicopee terminal *(Id.)*. At all times, he got along with his managers and they treated him with respect (A108-109). At no time during or after his employment, did Plaintiff ever make or file any type of internal or external complaint against Estes for any unlawful actions, unfair treatment or inappropriate actions (A74). He testified that he had no interaction with nor did he do anything that would cause any of his managers identified above to have any hatred, ill-will or dislike towards him (A104-105). He has no reason to believe those managers were untruthful persons (A107-108). Plaintiff also testified that at no time during his employment did anyone with Estes ever instruct or tell him to do something that was illegal or a crime (A186-187).

    **B.**    **Estes' Policies and Policy Manuals**

6. During all times relevant to this case, Estes published to its employees a policies manual (or handbook) (Exhibit B, ¶4; A116-118, 171). On occasion, Estes would republish the entire handbook and get signed forms from all employees acknowledging their receipt and understanding of the policy manual and policies contained therein *(Id.)*. The signed forms were maintained in the employees' personnel files to establish proof they had received and read the

policies (Exhibit C, ¶2).

7. Among other policies, the handbooks contained Estes' Code of Conduct and its Equal Opportunity and Harassment in the Workplace Policy (A118-119; Exhibit B, ¶5; Exhibits D and E). The Code of Conduct sets forth rules by which all employees were required to abide relating to their performance and conduct *(Id.)*. Each of the handbooks distributed during Plaintiff's employment contained three separate receipts of acknowledgment and understanding *(Id.)*. One receipt form was for the entire handbook (A116-118; Exhibit B, ¶5; Exhibits F, G and H). Separate and individual receipts were also contained in each of the handbooks for the Code of Conduct and Equal Opportunity and Harassment in the Workplace policies (A118-119; Exhibit B, ¶5; Exhibits I, J, K and L).

8. All of Estes' handbooks and receipt acknowledgment forms contained employment-at-will and employment contract disclaimer provisions which read as follows:

> **"ACKNOWLEDGMENT FORM:  (Please Detach And Return To Human Resources)**
>
> I, _____, hereby acknowledge that I have received, read and understand the Estes policy manual, which provides guidelines on some of the policies, procedures, and programs affecting my employment. I understand that this policy manual does not include an exclusive list of all policies and procedures regarding employment related matters. I understand that Estes can, at its sole discretion, modify, eliminate, revise, or deviate from the guidelines and information in this handbook as circumstances or situations warrant.
>
> I also understand that any changes made by Estes with respect to its policies, procedures, or programs can supersede, modify, or eliminate any of the policies, procedures or programs outlined in this book. I accept responsibility for familiarizing myself with the information in this book and will seek verification or clarification of its terms or guidance when necessary. It is my obligation, which I acknowledge and undertake, to monitor and review all future changes and revisions and the like to this manual and all company policies.
>
> **I UNDERSTAND THAT ENTRY INTO EITHER A PART-TIME, PROBATIONARY, FULL-TIME, REGULAR, OR ANY OTHER TYPE OF EMPLOYMENT RELATIONSHIP REGARDLESS OF THE CONTENTS**

**OF EMPLOYEE POLICY MANUALS, HANDBOOKS, PERSONNEL MANUALS, BENEFITS PLANS, POLICY STATEMENTS AND THE LIKE, AS THEY MAY EXIST FROM TIME TO TIME, OR OTHER CUSTOMARY PRACTICES OR USAGES, SHALL NOT SERVE TO CREATE AN IMPLIED OR ACTUAL CONTRACT OF EMPLOYMENT OR CONFER ANY RIGHT TO REMAIN AN EMPLOYEE OF THE COMPANY OR OTHERWISE CHANGE IN ANY RESPECT THE EMPLOYMENT-AT-WILL RELATIONSHIP BETWEEN THE COMPANY AND THE UNDERSIGNED. THAT RELATIONSHIP CANNOT BE ALTERED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY THE PRESIDENT OF THE COMPANY. BOTH THE EMPLOYEE AND ESTES MAY END THE RELATIONSHIP AT ANY TIME, WITHOUT SPECIFIC NOTICE OR REASON, AND WITHOUT LIABILITY BY ESTES TO THE EMPLOYEE, EXCEPT FOR EARNED WAGES OR SALARY. WAGES DO NOT INCLUDE ANY COMPENSATION THAT REQUIRES THE EMPLOYEE TO BE ACTIVELY EMPLOYED AT THE TIME OF THE AWARD. IN ADDITION, THIS EMPLOYEE POLICY MANUAL DOES NOT CONSTITUTE OR CREATE AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT. ALL EMPLOYEES ARE TERMINABLE AT-WILL. JUST AS AN EMPLOYEE MAY TERMINATE HIS/HER EMPLOYMENT AT ANY TIME, ESTES HAS THE RIGHT TO TERMINATE THE EMPLOYMENT OF ANY EMPLOYEE AT ANY TIME AND FOR ANY REASON, WITH OR WITHOUT CAUSE OR NOTICE.**

**I ACKNOWLEDGE MY RECEIPT AND UNDERSTANDING OF THE FOREGOING DISCLAIMER"** (See Exhibits F, G, H, I, J, K and L)

9. The 2005, 2007 and 2010 versions of the Estes policy manuals all contained the employment-at-will and contract disclaimer provisions *(Id.*; A142-143). The same is true for the acknowledgment receipts for the Codes of Conduct and Equal Opportunity policies contained in those versions of the handbook *(Id.)*. The Plaintiff does not dispute that these provisions are the same and indeed admitted this fact in his deposition (A142-143, 179-180, 182). He admits that with regard to all three handbooks and their contents, these provisions made clear to him that his relationship with Estes was that of an employee-at-will at all times and without change (A182).

10. After Plaintiff was hired, and on January 26, 2006, Plaintiff signed a handbook acknowledgment form for the 2005 version of the policy manual (A166-167; Exhibit F). He also

signed a Code of Conduct acknowledgment receipt from the 2005 handbook which contained the employment-at-will provision (A168-169; Exhibit I). These all related to the April 19, 2005 version of the policy manual (A171-172; Exhibit M).

11. Estes re-published its policy manual in July, 2007 (A173; Exhibit N). Again, Plaintiff signed an acknowledgment of receipt and understanding form for the 2007 handbook (A169; Exhibit G). He also signed acknowledgment of receipt and understanding forms for the Code of Conduct and Equal Opportunity policies contained in the 2007 handbook (A169-170; Exhibits J & L). Again, all of these policies contained the same employment-at-will and contract disclaimer provisions (Exhibits G, J, L and N).

12. In February, 2010 Estes again republished the policy manual (A174; Exhibit B, ¶6; Exhibit O). This 2010 policy manual also contained the same employment-at-will and contract disclaimer provisions (Exhibits H and O).

13. Plaintiff admitted in his deposition that the Code of Conduct set forth certain automatic termination offenses such as insubordination and failure to follow directives (A116-118). He was aware of these rules and the consequences of violation *(Id.)*. He testified that he understood and agreed employers, such as Estes, must treat their employees equally and apply the rules consistently (A96-97). And lastly, Plaintiff admitted under oath that he did indeed refuse to sign the handbook receipt given to him in June of 2010 and that he understood such a refusal was an automatic termination offense under the Code of Conduct (A136).

    C.    <u>**The Events of June 18-22, 2010**</u>

14. The 2010 handbook was finalized for republishing to employees on or about February 16, 2010 (Exhibit B, ¶7; Exhibit O). Over the next two months, boxes of these 2010 handbooks

were sent to the various Estes terminals for distribution and the gathering of acknowledgment receipts from Estes' hourly employees *(Id.)*. The boxes of handbooks for the Chicopee terminal were received in approximately May, 2010.  (Exhibit C, ¶3).  Dan O'Connor, the Terminal Manager, thereafter instructed his first line supervisors to distribute the handbooks in June, 2010 and obtain the acknowledgments of receipt and understanding from the Chicopee employees (Exhibit C, ¶3).  Bob Senk, the dispatch supervisor, was tasked with handing out the handbooks and obtaining receipts for those persons he was responsible for, the drivers *(Id.)*.  The dock supervisors were responsible for distributing the handbooks and obtaining the receipts from the dock workers *(Id.)*.  The acknowledgment forms would then be gathered and forwarded to the Human Resources Department in the home office for placement in each individual employee's personnel file *(Id.)*.

15. On Friday, June 18, 2010, Mr. Senk began distributing and obtaining the acknowledgment forms from the drivers as they came into work that day (Exhibit C, ¶4).  The Plaintiff came in and went to the dispatch window (A110-111, 138-139, 151-152).  Plaintiff states that he was handed one of the handbook receipts or acknowledgment forms which up at the top had his name pre-printed in the identification blank (A110-111, 136-139, 151-153).  Plaintiff asked Bob what the form was *(Id.)*.  Bob stated that it was something that they needed to sign *(Id.)*.  He told Plaintiff to look it over and sign it *(Id.)*.  Plaintiff responded that he would look over the form and bring it back *(Id.)*.

16. Plaintiff then went out on his route to make his pickups and deliveries of freight (A152-153).  He looked over the document *(Id.)*.  He testified that at that time, he was uncomfortable with the acknowledgment form because it had his pre-printed name at the top (but not on the

7

acknowledgement signature line at the bottom of the form) *(Id.)*. So he struck out his printed name, initialed it and dated it *(Id.)*. He came back to the terminal from his initial run and returned to the dispatch window *(Id.)*. Mr. Senk was in the dispatch area and Mr. O'Connor was sitting at a desk behind Mr. Senk *(Id.)*. Plaintiff testified that he handed the form back to Senk stating "I'm not comfortable signing this" *(Id.)*. At that point, Mr. Senk turned to Mr. O'Connor and stated that Plaintiff wasn't going to sign the acknowledgment form *(Id.)*. O'Connor asked him why not? *(Id.)*. Plaintiff stated to his terminal manager that he was uncomfortable with it *(Id.)*. Mr. O'Connor then asked the Plaintiff "Well, what if I have to send you home?" *(Id.)*. Plaintiff replied "Do what you have to do" *(Id.)*. At that point Mr. O'Connor left the dispatch office *(Id.)*. Mr. Senk sent Plaintiff back out on his route with some more freight *(Id.)*.

17. When Plaintiff returned to the terminal the second time on this Friday, June 18, he was informed by the yard jockey that Mr. O'Connor wanted to see him *(Id.)*. He went to O'Connor's office *(Id.)*. O'Connor informed Plaintiff to just go ahead and sign the document, it was no big deal (A153-155). Plaintiff repeated that he was uncomfortable signing it *(Id.)*. O'Connor told Plaintiff that everyone else had signed the acknowledgment form *(Id.)*.

18. Plaintiff testified that the unstated reason he was "uncomfortable" and would not sign the acknowledgment form had nothing to do with the form's content or the employment-at-will/contract disclaimer provision (A110-112, 136-137, 139-140, 144). He just didn't like the fact that his printed name had been placed at the top of the form when given to him *(Id.)*. On the previous acknowledgment receipts he had gotten for the handbooks, he didn't recall his name pre-printed at the top *(Id.)*. That's why he struck out his name, initialed the strikeout and dated it *(Id.)*. The name printed on the form was simply the identity of the employee and was not on the

8

signature line of the form following the acknowledgment of receipt and understanding provision (A138; Exhibits F, G & H). Plaintiff testified that his discomfort and reason for refusing to sign the form was his belief that because his name was pre-printed at the top of the form, that meant that he agreed with the terms of the form (A140). Significant to this case, Plaintiff acknowledged that he didn't know, and doesn't know to date, whether the acknowledgment form he received was for a 2010 handbook or a 2007 handbook (A147-148). But he does admit in his deposition that the acknowledgment form did contain the employment-at-will/contract disclaimer provision and cannot dispute that this was the same provision that was contained in the earlier handbooks and acknowledgment forms he had signed and received for the 2007 handbook (A141-142). In fact, it was (A182).

19. Plaintiff and Mr. O'Connor then went into the terminal manager's office and sat down (A155-157). Mr. O'Connor told the Plaintiff that he was a little late getting the handbook paperwork out and asked the Plaintiff why he wouldn't sign it *(Id.)*. Plaintiff responded that he "felt uncomfortable" *(Id.)*. He told O'Connor about his printed name at the top of the form *(Id.)*. O'Connor then responded "Well, everyone has signed one of these forms at one time or another". Plaintiff asked "Well, where is my original one?" *(Id.)*. O'Connor responded "Which one, the one when you started?" *(Id.)*. Plaintiff stated "Yes, I guess" *(Id.)*. Mr. O'Connor then reached in a box and pulled out a handbook, with enclosed receipts, and handed it to Plaintiff *(Id.)*. O'Connor then stated "I really don't know what to do. I'm going to send you back out. I'm going to check with HR." *(Id.)*. The Plaintiff then went back out on his run with a copy of the handbook *(Id.)*.

20. When Plaintiff returned to the terminal he continued to refuse to sign the

acknowledgement form for the handbook (A157-159). Mr. O'Connor told him to take the handbook home, look it over that weekend and they would meet again next Tuesday, June 22, 2010 when he was scheduled to work, at which time Plaintiff could tell his manager whether or not he was going to sign it *(Id.)*.

21. After his encounters of Friday, June 18 and Plaintiff's repeated refusal to sign the acknowledgment form, Mr. O'Connor contacted the Regional Human Resources Manager, Renee Bloom (Exhibit C, ¶4). He advised Ms. Bloom of what had transpired with the Plaintiff and his refusal to follow the directive concerning signing the acknowledgment form *(Id.)*. He asked what he should do *(Id.)*. Ms. Bloom instructed Mr. O'Connor that the Plaintiff's refusal to sign the acknowledgment form was a termination offense under the Estes' Code of Conduct (Exhibit B, ¶8). She was made aware that Mr. O'Connor had given Plaintiff a copy of the handbook for him to review over the weekend and the Plaintiff would be getting back with Mr. O'Connor Tuesday when he returned to work *(Id.)*. Ms. Bloom instructed Mr. O'Connor to follow-up with the Plaintiff *(Id.)*. She reiterated, however, that if the Plaintiff continued in his refusal to follow the directive to sign the form, they had no choice but to terminate his employment *(Id.)*. Ms. Bloom told Mr. O'Connor to ensure that the Plaintiff was aware of this consequence *(Id.)*.

22. Over the weekend, the Plaintiff did look over the handbook, containing the receipts, that Mr. O'Connor had given him (A158-160). He admits in his deposition that the handbook contained an at-will employment/contract disclaimer clause on the first page after the cover *(Id.)*. An identical clause was contained on the last page just before the back cover of the handbook *(Id.)*. The handbook also contained acknowledgment forms for the Code of Conduct and the

EEO policy which set forth identical language expressly disclaiming any express or implied contract *(Id.)*. He did not take the handbook he was given by Mr. O'Connor or any of the four disclaimer clauses contained in that handbook and compare them to the contract disclaimers contained in the earlier handbooks he had received and signed for the 2005 and 2007 manuals *(Id.)*. He does not dispute, and it is undisputed, that the employment-at-will/contract disclaimers are the same and he remained in the status as an at-will employee throughout his employment under all versions of the handbook *(A159-160, 182)*.

23. Plaintiff returned to work shortly before 1:00 p.m. on Tuesday, June 22, 2010 for his regularly scheduled shift (A160-162). He met with Mr. O'Connor and another supervisor, Mark Cato *(Id.)*. Mr. O'Connor asked him in the meeting whether he had reconsidered signing for the handbook *(Id.)*. O'Connor stated that he had called Renee Bloom, the Regional HR Manager, and confirmed that if Plaintiff continued in his refusal to sign the acknowledgment form, that was insubordination under the Code of Conduct and he could be fired *(Id.)*. Plaintiff responded that he was still uncomfortable signing it (A162). At that point, Mr. O'Connor again contacted the Human Resources Manager who made contact with Ms. Gerczak, Assistant Vice President of Human Resources in the Corporate HR Department (Exhibit C, ¶5).

24. Ms. Bloom and Ms. Gerczak were made aware of what had transpired with the Plaintiff, the fact that he had continually refused to follow the directive to sign the acknowledgment and that he gave no good reason for his repeated failure to comply with directive (Exhibit B, ¶9; Exhibit C, ¶5). Ms. Gerczak and Ms. Bloom concluded that Plaintiff had engaged in insubordination for failure to follow a directive which was an automatic termination offense Estes' Code of Conduct (Exhibit B, ¶9). This was akin to an employee's failure to sign any

required acknowledgements, such as a disciplinary action form, DOT-required forms and the like (Exhibit B, ¶9). In order to consistently apply Estes' disciplinary practice in this situation, the decision was made to terminate the Plaintiff's employment *(Id.)*. Mr. O'Connor made a second offer and gave Plaintiff another chance to sign the acknowledgment form (A162). Plaintiff responded "I am going to have to stand my ground because I'm not comfortable with it". At that point, he was informed of his termination by Mr. O'Connor *(Id.)*.

25. According to Plaintiff's testimony, this is all that was said in these meetings (A164). Per his deposition admissions, Plaintiff never stated that he was refusing to follow the directive and sign the acknowledgment form because of any contract disclaimer, any change in his employment-at-will status or for any other reason except that he was simply not comfortable signing the form *(Id.)*. Plaintiff testified that during the entire meeting and when he gathered up his personal belongings, the managers were very respectful and cordial to him (A163-164).

        D.      **Plaintiff's Post-Termination Espoused Reasons for his Refusal to Follow the Directive to Sign Acknowledgment Form**

26. While he made none of these known to Estes during his employment or at the time of his termination, in his deposition years later Plaintiff now states several belated reasons for refusal to sign the acknowledgment form. He testified that one reason for refusing to sign the form was because he believed the handbook receipt presented to him in June, 2010 somehow changed his employment status with Estes or in some way was different from the earlier handbook receipts he had signed.

> "Q: Right. And your point there is that you're the one that refused to sign the acknowledgment because you thought it was changing your at-will status and, in fact, he did sign it, correct, to your knowledge?
>
> A: Yes." (A109-110).

27. However, at the time he refused to sign the June, 2010 presented acknowledgment form, he had not compared it to the at-will/contract disclaimer provisions he had earlier signed to see if there were any differences or if the new form changed his at-will status (A158-160). As a matter of fact, in his deposition he now testified that the earlier forms and his earlier status there from were the same as that contained in the document he was presented in June of 2010—he was at all times an at-will employee without alteration (A174-175, 182; Exhibits F, G and H).

28. Plaintiff's employment-at-will status and the disclaimers were constant throughout the handbook revisions and throughout his employment (Exhibits F, G, H, I, J, K, L, M, N and O). Moreover and pivotal, Plaintiff testified that at no time prior to his deposition, and certainly not at any time during his employment with Estes, did he have any type of employment contract or contract containing in any terms or conditions or duration between himself and Estes Express Lines (A131-133). He never had a contract signed by the president of Estes *(Id.)*. He never signed an employment contract *(Id.)*. There were no verbal contracts of employment between him and Estes *(Id.)*. He could quit at any time *(Id.)*. He does not dispute that Estes could let him go at any time *(Id.)*. He was at all times an at-will employee *(Id.)*.

29. Another reason espoused by Plaintiff in his deposition as to why he didn't sign the June, 2010 acknowledgment form was because it had his pre-printed name on the identification line at the top of the blank form (A144). Plaintiff says that he thought because his name was pre-printed on the top of the form, he might be "waiving being an employee because [he] could be fired at any and for any reason", "that was open invitation for Estes to fire me" and that if he "got hurt on the job, because of this disclaimer the company would not be liable" (A143-144). These are the only and exclusive reasons he now gives for refusing to sign the acknowledgment

form (A144-145). There are no other reasons *(Id.)*.

30. Contrarily, there is nothing contained in any of the handbooks and acknowledgment forms which changed Plaintiff's status as an at-will employee (Exhibit F, G, H, I, J, K, L, M, N and O). The at-will/contract disclaimer provisions were consistent and the same throughout his employment *(Id.)*. He had signed the acknowledgment forms containing the same language and disclaimers in connection with his receipt of the 2005 and 2007 handbooks (Exhibits F, G, I, J, K and L). Plaintiff testified in his deposition that the language and terms of these disclaimers—the ones he previously signed and the one he refused to sign in 2010—were the same (A182).

### E. <u>Termination of Plaintiff's Employment</u>

31. Plaintiff repeatedly admits the true and real reason for his termination on June 22, 2010 was insubordination and failure to follow directives in his refusal to sign the acknowledgment form, which was an automatic termination offense under Estes' consistently applied policies (A45-46, 47-48, 97, 116-118, 136). Prior to June of 2010, he was aware of Estes' Code of Conduct and these rules and their consequences (A136). He did in fact repeatedly refuse to and never did sign an acknowledgment sheet between June 17 and June 22, 2010 (A109-110). Plaintiff is aware of no exceptions to this consistently applied policy or of anyone who refused to sign a handbook receipt or a policy receipt and was not terminated (A183). He does not dispute that if he would have merely signed the acknowledgment form in June of 2010 like everyone did, he would still be working for Estes (A183-184).

32. The persons responsible for the decision to terminate the Plaintiff's employment were Renee Bloom and Brenda Gerczak (Exhibit B, ¶10). He was in fact terminated for refusing to follow a directive and insubordination *(Id.*; Exhibit P). Plaintiff testified that these two

individuals had no reason to harbor hatred, ill-will or dislike toward him (A104-105). From all Plaintiff's knowledge, evidence and belief, Ms. Bloom and Ms. Gerczak never did anything wrongful, unfair or unlawful to him! (A106-107). Plaintiff testified:

> "Q: Let me explain it further. You've got the supervisors at the terminal. We have somebody who is not signing a handbook receipt when told to do so and I know you had reasons in your mind being comfortable with it, but you are clearly refusing to do something they are asking you, correct?
>
> A: Yes.
>
> Q: And that is a termination offense under Estes' policy, correct?
>
> A: Yes." (A187-188).

### F. The Policy Manuals Presented to Chicopee Employees in June 2010

33. While having no impact on Plaintiff's insubordinate act and certainly not being a reason for Plaintiff's refusal to sign the acknowledgment form per his own testimony, it was discovered in early August, 2010 by the Human Resources Department in Richmond that in June, 2010 the Chicopee managers had mistakenly distributed policy manuals from a box containing the 2007 handbooks rather than the box containing the 2010 handbooks (Exhibit C, ¶6). The Chicopee employees received a 2007 handbook in June of 2010 *(Id.)*. They all complied with the directive to sign the acknowledgment forms and thus did not engage in insubordination—with the exception of the Plaintiff *(Id.)*. The corporate Human Resources Department discovered the error when they received acknowledgment forms signed by the Chicopee employees which contained a 2007 date on them *(Id.)*. Human Resources then contacted the Chicopee management and instructed them to distribute the 2010 version and get acknowledgment forms for that handbook *(Id.)*.

34. Regardless, this had nothing to do with Plaintiff's insubordination and refusal (A70-71,

109-110, 131-133, 140-145). He in fact was given a handbook by Mr. O'Connor in the office on June 18, 2010 and never knew that it was an earlier version, nor was this a basis for his refusal to sign the acknowledgment form *(Id.*; A124-125). He was presented a handbook by O'Connor identified as Exhibit N to this Memorandum (A124-125, Exhibit N). The 2007 handbook contained the same employment-at-will/contract disclaimer language as did the February, 2010 policy manual which was later distributed in August, 2010 (A182; Exhibits N and O).

35. Plaintiff agrees with and otherwise does not dispute any of this (A158, 164-166, 173-174). And, he admits that the handbook he was given in June of 2010 as well as those presented to him which he signed earlier made it clear that he was an employee-at-will (A179-180).

### G. Plaintiff's Breach of Covenant of Good Faith and Fair Dealing Claim

36. Without equivocation, the Plaintiff clearly testified that at no time during his employment with Estes did he have any type of employment contract (A131-133). He was an at-will employee throughout his employment *(Id.)*. The handbooks and acknowledgment forms he received throughout his employment made this employment-at-will status clear to him (A179-180, 182-183). Plaintiff's testimony conclusively establishes that he had no type of contractual relationship with Estes and was an at-will employee (A131-133, 179-180, 182-183).

37. Plaintiff testified that with any employer for whom he worked prior to his deposition and thus including Estes, he had no action taken against him which he considered to be unfair, wrongful or unlawful or which constituted improper treatment (A62). He was never denied any benefit or entitlement that he should have gotten as an employee of Estes (A71). The persons responsible for the termination of his employment, according to Plaintiff's evidence, knowledge and belief, never did anything wrongful, unfair or unlawful to him (A106-107).

38. While he was employed by Estes and afterwards, he was compensated for all his work and all services performed for Estes (A133-135). From all the Plaintiff's belief and evidence, he knows of no one at Estes who did anything to him with any bad faith intent (A185-186). No one involved in the situation leading to and causing his termination had any malice or ill-will towards him, or committed any fraud against him (A184).

39. Furthermore, Plaintiff testified that he does not dispute that Estes did not even have to publish a policy handbook or its policies (A186). He admits during all the events at issue in this case in June of 2010, at no time did anyone lie to him (A186-187). No one with Estes told him to do anything that was a crime or illegal *(Id.)*.

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel for Estes hereby certifies that he has conferred with Plaintiff's counsel in a good faith attempt to resolve or narrow the issue herein.[3]

WHEREFORE, Defendant Estes Express Lines prays that the Court grant this Motion for Summary Judgment and that Plaintiff's Complaint be dismissed with prejudice in its entirety. Estes also respectfully requests that its costs be taxed against Plaintiff, and that Estes be awarded its expenses, reasonable attorneys' fees incurred in the defense of this action, and any other form of relief which the Court deems proper.

This the 7th day of May, 2014.

[*Signatures on following page*]

---

[3] The parties have informed the Court that the Plaintiff "intends to pursue only Count I . . . in his Complaint." *See* Notice Pursuant to Case Management Conference, filed May 6, 2014, Document 20.

>*/s/ Wesley S. Chused*
>Wesley S. Chused, BBO # 083520
>Looney & Grossman LLP
>101 Arch Street
>Boston, MA  02110
>Telephone:  (617) 235-8651
>Facsimile:  (617) 951-2819
>wchused@lgllp.com
>
>David L. Terry, (NCSB # 11113)
>*Admitted pro hac vice*
>Poyner Spruill, LLP
>One Wachovia Center
>301 S. College St., Suite 2300
>Charlotte, NC 28202
>Telephone:  (704) 342-5272
>Facsimile:  (704) 342-5264
>dterry@poynerspruill.com
>
>ATTORNEYS FOR DEFENDANT ESTES EXPRESS LINES

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed manually or through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (see below).

>John D. Ross, III, Esq. - jackross@rossrosspc.com
>Ross & Ross, P.C.
>121 State Street, Suite 201
>Springfield, MA  01103

This the 7th day of May, 2014.

>*/s/ Wesley S. Chused*

4837-4383-1323, v. 1