# Ex. A

Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3                 SPRINGFIELD DIVISION

4                      Case No. 3:13-cv-30126-KPN

5

6

7      * * * * * * * * * * * * * * * * * * * * * *

8      JOHNNY W. GREEN, JR.,  *

9         Plaintiff          *

10        vs.                 *

11     ESTES EXPRESS LINES,   *

12        Defendant           *

13     * * * * * * * * * * * * * * * * * * * * * *

14

15

16          DEPOSITION OF:  JOHNNY WILL GREEN, JR.

17          CATUOGNO COURT REPORTING SERVICES

18                 1414 Main Street

19             Springfield, Massachusetts

20           November 14, 2013   9:00 a.m.

21

22

23               Kristen M. Edwards

24                 Court Reporter

Johnny Will Green, Jr.
November 14, 2013

1    A.    Yes, he was born in 1988.

2    Q.    **And then Tamara A. Green born in**

3    **1989?**

4    A.    Yes.

5    Q.    **And then Caylina J. Green?**

6    A.    Yes.

7    Q.    **She was born in 1991?**

8    A.    Yes.

9    Q.    **And was Paris the mother of those**

10   **three children?**

11   A.    Yes, sir.

12   Q.    **Were any of those children living**

13   **with you at the time you worked for Estes?**

14   A.    Yes.  When I worked, yes.

15   Q.    **Because you were with Estes a little**

16   **short of five years.**

17   A.    Short of five or over five years?

18   Q.    **You came in 2004?**

19   A.    Yes.

20   Q.    **And you left in 2010?**

21   A.    Right.  That's not short of five

22   years.

23   Q.    **Between five or six years.**

24   A.    Okay.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 45

```
1          A.      The next three years, I guess, yes,
2    because they had different titles they changed me
3    but --
4          Q.      Tell me if this sounds right to you.
5                  You were in the P and D local pedal
6    run for about three years and then the recession
7    hit and Estes was having a reduction enforced and
8    rather than lay you off they let you run the hub
9    and do some yard jockey work; does that sound
10   accurate?
11         A.      Yes.
12         Q.      And then you returned to your P and
13   D job around May 31st as far as actually being
14   reclassified?
15         A.      As a driver.
16         Q.      Yes, as a driver on May 31, 2010;
17   does that sound right?
18         A.      That sounds about right.
19         Q.      And then you were let go.  Your
20   employment with Estes ended on June 22, 2010,
21   correct?
22         A.      That sounds about right, yes.
23         Q.      And what you were let go for was
24   insubordination of failure to follow directives,
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

Page 46

1    which is an automatic termination offense under

2    Estes code of conduct, right?

3          A.     Yes, that's what they told me.

4          Q.     In fact, in your documents, in your

5    complaint in the papers I've read, you admit that

6    that's an automatic termination offense and you

7    admit that you refused to sign that employee

8    handbook receipt, correct, that's true?

9          A.     Say that again?

10         Q.     According to your paperwork that you

11   filed and with the unemployment in your complaint,

12   you admit, number one, that you refused to sign an

13   employee acknowledgment form, which I call a

14   receipt, and you admit that you were told to do it

15   and you admit that that's a termination offense

16   under Estes' policy, correct?

17         A.     Yes.

18         Q.     And then indeed that is the true and

19   real reason that they let you go as you

20   understand, right?

21         A.     Yes.

22         Q.     So to get back to something we

23   talked about a little bit earlier, you actually

24   worked for Estes about five years and seven

Johnny Will Green, Jr.
November 14, 2013

Page 47

1    months, correct?

2         A.     Sounds about right.

3         Q.     Now, with the exception of your

4    termination on June 22, 2010, aside from that,

5    you've never had any other negative or adverse job

6    action taken against you by anyone with Estes

7    during your employment; is that accurate to say?

8         A.     Say that again?

9         Q.     Sure, that is fine.  If you don't

10   hear it, that is fine.

11              You got let go.  That's an adverse

12   action, something that happens to you that is

13   negative, correct?

14        A.     Okay.

15        Q.     Other than that there was no other

16   tangible adverse job action taken against you by

17   anybody with Estes during your employment; is that

18   true?

19        A.     Yes.

20        Q.     Let me show you something here, sir.

21   I don't know if you have seen this, but I will

22   mark this as Exhibit 2 to your deposition.

23

24

**Johnny Will Green, Jr.**
**November 14, 2013**

```
1              (Exhibit 2, payroll and employment

2              change form, marked)

3

4         MR. TERRY:  For the record, this is

5      a payroll and employment change form that

6      has to do with the termination of

7      Mr. Green's employment.

8         Q.    (By Mr. Terry)  Have you seen this

9   before?

10        A.    Yes.

11        Q.    Did you see it on the day that you

12  were let go or afterwards in this lawsuit?

13        A.    I don't remember exactly when I seen

14  it, but I do remember getting this.

15        Q.    And what is written on here about

16  your name, when you got let go, Social Security

17  number, last day worked, reason for termination,

18  all that is accurate; is that correct?

19        A.    No, my name is not accurate.  That

20  is not my full name.

21        Q.    It just has Johnny Green?

22        A.    Yes.  The termination date doesn't

23  have the actual year of date.  It says 6/22, no.

24        Q.    You mean the signature line?
```

**Johnny Will Green, Jr.**
**November 14, 2013**

1          A.      Not that I can remember.

2          Q.      With any employer prior to today,

3    have you had any action taken against you which

4    you considered to be unfair, wrongful and unlawful

5    or improper treatment?

6          A.      No.

7          Q.      Prior to coming with Estes, did you

8    ever suffer any on-the-job injuries?

9          A.      On the job, not that I can recall,

10   no.  Not on the job, no.

11         Q.      Any on-the-job injuries since you

12   left Estes with any employer?

13         A.      No.

14         Q.      And I don't see any but did you have

15   any on-the-job injuries while you were with Estes?

16         A.      On the job, no, I can't stay that I

17   did.

18         Q.      And these are just background

19   questions because of the nature of the claim, sir.

20         A.      Okay.

21         Q.      Have you had any medical problems,

22   treatment or conditions in the last ten years, not

23   a cold, not the flu, not a sprained ankle, any

24   significant medical conditions in the last ten

Johnny Will Green, Jr.
November 14, 2013

Page 70

1    asked him what his theory of the case was.

2              You believe that you were wrongfully

3    terminated, correct?

4         A.    Yes.

5         Q.    And your claim is based on the fact

6    taken from what was said there, you believed that

7    the acknowledgment form presented to you in

8    June 2010 that you were asked to sign changed your

9    employment status with Estes and made it different

10   from your earlier status you had with Estes when

11   you signed earlier receipts for policy manuals

12   before June of 2010, is that true; is that the

13   reason you didn't sign it and why you believe you

14   were wrongfully terminated?

15             That is what was said in court, and

16   I am just asking you.

17        A.    Yes.

18        Q.    And that is what you are suing for

19   in your complaint, correct?

20        A.    Right.

21        Q.    That is your claim?

22        A.    Yes.

23        Q.    Based on your knowledge, belief and

24   evidence, right?

Johnny Will Green, Jr.
November 14, 2013

Page 71

```
1          A.      Yes.
2          Q.      And you state, and this is true,
3     that the only reason for your termination, there
4     is no other reason, was your refusal to sign that
5     receipt or acknowledgment form in June of 2010,
6     correct?
7          A.      Yes.
8          Q.      And a termination of your employment
9     is the only unlawful or unfair act that you have
10    any evidence, knowledge or belief of; is that
11    correct?
12         A.      Yes.
13         Q.      Were you ever denied any benefit or
14    entitlement that Estes employees get that you
15    should have gotten but didn't get that you are
16    aware of?
17         A.      While I was employed?
18         Q.      Yes, sir.
19         A.      No, I don't believe so.
20         Q.      Other than this lawsuit that we are
21    here for today, have you ever been involved in any
22    other civil litigation?
23         A.      Not that I recall.
24         Q.      Do you know what civil litigation
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 74

1          Q.      (By Mr. Terry)  Other than that, any

2      other civil or litigation against an employer,

3      claims against any employer in the legal system?

4          A.      No.

5          Q.      Let me move it down a notch.  We

6      talked about the courts.  That is federal, state

7      courts.  Moving down a notch.

8                  Prior to today with any employer you

9      have been affiliated with, have you ever filed any

10     type of administrative charge, grievance or a

11     complaint with any government agency against an

12     employer?

13         A.      No, not that I know.

14         Q.      Move it down a third notch here.

15                 With any employer you have worked

16     with prior to today, have you ever filed any type

17     of internal complaint to someone in the company or

18     to the employer complaining of unlawful actions,

19     unfair treatment and inappropriate actions in your

20     entire work life?

21         A.      No, not that I know of.

22         Q.      Again, these are just background

23     questions.  We have or will check.  But prior to

24     today, have you ever been convicted of any crime?

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1       A.      I am not sure.  I really don't --

2       Q.      Do you know if witnesses prepared

3  one; have you prepared one?

4       A.      Statements from other people you are

5  saying?

6       Q.      Yes.

7       A.      No.

8       Q.      Are you aware of any statements that

9  would refute your claim?

10      A.      Not that I know of.

11      Q.      As we sit here today, Mr. Green,

12  have you ever presented any problems, limitations

13  or adverse issues to any employer or manager

14  you've worked for prior to today that would cause

15  that person to hold an ill will, grudge or dislike

16  towards you?  I don't know of any but do you?

17      A.      No.

18      Q.      And a hypothetical question here.

19              Do you agree that employees should

20  be treated fairly and equally?

21      A.      Yes.

22      Q.      And if you've got an employee who is

23  in a particular situation that the employer should

24  treat that employee like he or she has treated

Johnny Will Green, Jr.
November 14, 2013

1    other employees whether that be good or harsh and

2    they need to be treated equal in the same

3    circumstances; do you believe that?

4         A.    Yes.

5         Q.    With any document that you've

6    written, signed or filled out which relate to your

7    employment with Estes or verbal communications,

8    have you ever provided false information with

9    respect to Estes?

10        A.    No.

11        Q.    Misleading information?

12        A.    No.

13        Q.    Omitted or hid information which was

14   requested?

15        A.    No.

16        Q.    Let me ask you this.  This is

17   another hypothetical question.

18              You worked for Estes for five years

19   seven months.  How would you rate yourself as an

20   employee on say a scale of one to ten, ten

21   greatest employee, one the worst?

22        A.    Ten and a half.

23              MR. ROSS:  What did you say?

24              THE WITNESS:  Ten and a half.

Johnny Will Green, Jr.
November 14, 2013

1       Q.    Have you held any under the table

2   jobs since you left Estes?

3       A.    No.

4       Q.    You know what I am talking about;

5   like somebody paying you cash?

6       A.    No.

7       Q.    This is -- I am going to ask you a

8   question and ask you the same question for a list

9   of people, okay, so I need you to give me a yes or

10  no for the people for this question.

11      Is there anything, Mr. Green, that

12  you ever said or did or any interaction you had

13  with the following persons that would cause them

14  to have any hatred, ill will or dislike toward

15  you, so that is the question, Gordon Jennings?

16      A.    I don't know the name.

17      Q.    If you don't know the person, then

18  the answer is I don't know.

19      A.    I don't know.

20      Q.    He was your district operations

21  manager.  Did you not have a lot of contact with

22  him?

23      A.    No.  I didn't have a lot of contact

24  with him.

Electronically signed by Kristen Edwards (401-299-812-4216)    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1          Q.      So there is nothing; you didn't have

2     any problem; you didn't present any problem to him

3     or nothing about you that would cause him to hate

4     you?

5          A.      No.

6          Q.      Dan O'Connor?

7          A.      No.

8          Q.      Bob Sink?

9          A.      No.

10         Q.      Mark Kato?

11         A.      No.

12         Q.      Rodney Willis?

13         A.      No.

14         Q.      Helen Pandoli?

15         A.      I don't remember her, no.

16         Q.      Lady in the office?

17         A.      No.

18         Q.      Denise Thompson?   You may not know

19     her.

20         A.      No.

21         Q.      Renee Bloom?

22         A.      No.

23         Q.      Raymond Gorzack?

24         A.      No.

Page 106

1        Q.      Okay, second question for these

2   people.  Have any of these persons from all your

3   knowledge, belief and evidence have any one of

4   these persons ever did anything wrongful, unfair

5   or unlawful to you, Gordon Jennings?

6        A.      Does that have to do with me being

7   fired?

8        Q.      Well, if you think the person got

9   you fired, that may be something but other than

10   that.

11        A.      I really don't know, because he

12   didn't fire me.  Dan did, so, but he was --

13        Q.      From all your knowledge, belief and

14   evidence, did Gordon Jennings ever do anything

15   improper, unfair or unlawful to you?

16        A.      No.

17        Q.      Dan O'Connor?

18        A.      Other than terminate me for this, I

19   guess would be the only thing I could see.

20        Q.      Rodney Willis?

21        A.      No.

22        Q.      Mark Kato?

23        A.      No.

24        Q.      Bob Sink?

Johnny Will Green, Jr.
November 14, 2013

Page 107

1          A.     No.

2          Q.     Helen Pandoli?

3          A.     No.

4          Q.     Denise Thompson?

5          A.     No.

6          Q.     Renee Bloom?

7          A.     No.

8          Q.     Brenda Gorzack?

9          A.     No.

10          Q.     The last question about these group

11     of people and you may not be able to answer this

12     one for some of them because the answer to this

13     question comes from the fact you have been with

14     these people for a while, so I am asking for your

15     opinion on something so you would have to seen

16     them, talk to them, listen to them, watch them.

17     Some of them you may have not seen enough so you

18     don't have an opinion but the question I have got

19     is based on your observations of these people.

20               Are they truthful or untruthful

21     people?  So with Gordon Jennings, probably with

22     him you don't know, right?

23          A.     A lot of them I don't know, because

24     I really kept to myself.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1      Q.      How about Dan --

2      A.      I don't know.

3      Q.      -- O'Connor?

4              Bob Sink?

5      A.      I don't know.

6      Q.      Mark Kato?

7      A.      I would say he is a pretty truthful

8  person.

9      Q.      Rodney Willis?

10     A.      He is a pretty truthful person.

11     Q.      Helen Pandoli?

12     A.      I don't really know.

13     Q.      Denise Thomson?

14     A.      I don't know.

15     Q.      Renee Bloom?

16     A.      I don't know her that much.

17     Q.      And Brenda Gorzack?

18     A.      I don't know.

19     Q.      From talking to the people that

20  worked with -- that watched you for five plus

21  years, tell me if these are true statements.

22              You got along good with your

23  managers, true?

24     A.      Yes.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

1        Q.      You treated them with respect?

2        A.      Yes.

3        Q.      They treated you with respect?

4        A.      Yes.

5        Q.      And they got along good with you,

6    too?

7        A.      I didn't have a choice, yes.

8        Q.      Mr. Green, are you aware of any

9    other complaints, charges or lawsuits being made

10   against Estes by someone claiming the same thing

11   you are claiming in this case?

12       A.      No.

13       Q.      Regardless of whether they brought a

14   lawsuit, are you aware of -- you know what you're

15   claiming.  Do you know of anyone else that has

16   suffered from the same alleged unfair treatment or

17   wrongdoing that you're claiming here?

18       A.      Do I know of anyone else?

19       Q.      That stood in your shoes, whether

20   they sued or not, that suffered the same thing you

21   are claiming in this case.

22       A.      I can't because they still work.

23   They still have their job.  I lost mine.

24       Q.      Right.  And your point there is

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Page 110

1    you're the one that refused to sign the

2    acknowledgment because you thought it was changing

3    your at-will status and, in fact, they did sign

4    it, correct, to your knowledge?

5         A.    Yes.

6         Q.    By the way, that acknowledgment slip

7    that they gave you between June 17th and June 22nd

8    of 2010, you never did sign it; is that correct?

9         A.    Yes, right, I did not.

10        Q.    You never wrote anything on those --

11   on that receipt, did you?

12        A.    Actually, when I came into work that

13   day --

14        Q.    Which day?

15        A.    The first day that they handed me

16   the -- I guess it would be the 17th.  I am not

17   sure of the exact date when I came in.  They --

18   Bob Sink handed me the form at the window, and

19   someone had print my name.

20        Q.    I see what you're saying, and I saw

21   that in the unemployment hearing.

22               When Bob gave you the booklet, it

23   has the form in it.

24        A.    I never got a booklet.  They just

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 111

1    gave me a copy of the page out of the book.

2         Q.      The receipt?

3         A.      Yes.  I guess that is what it's

4    called.

5         Q.      That has the disclaimer on it and a

6    signature area.

7         A.      Right.

8         Q.      And what you are saying is somebody

9    had preprinted your name --

10        A.      For acknowledgment.

11        Q.      Well, actually, there are two lines

12   on there.  One is printed name and one is

13   signature.

14        A.      Yes, they printed on top.

15        Q.      They printed on the first line and

16   somebody preprinted your name on there?

17        A.      Right.  And then they said to me

18   that I had to hand it back in today.

19        Q.      We will get into that in a minute.

20               But did you ever write anything on

21   the form?

22        A.      I crossed out where they printed my

23   name and put my initials and the date beside it.

24        Q.      Other than that, you never wrote on

Johnny Will Green, Jr.
November 14, 2013

Page 112

1      the form, right?

2              A.      No.

3              Q.      Am I right?

4              A.      Yes, you are right.

5              Q.      Now, do you know of any other

6      employees of Estes who were terminated for the

7      same reason that you were and that is

8      insubordination of failure to follow directive

9      from a supervisor?

10             A.      No, I don't.

11             Q.      Other than that, after you left

12     Estes, I know you drew unemployment then.  Did you

13     ever draw unemployment at any other time in the

14     last 20 years?

15             A.      Oh, yes, yes.

16             Q.      Do you remember --

17             A.      When I got -- when I left Dexters,

18     when I get terminated from that job, I believe I

19     collected at that point and I worked a couple of

20     construction jobs.  So when we got laid off, I was

21     on unemployment.

22             Q.      I am going to show you something we

23     talked about.  I wanted to put it on the record

24     since we referred to it.  This is a copy of the

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

```
 1            Q.      Mr. Green, when you worked at Estes
 2     in Chicopee, how was that?
 3            A.      It was fine.
 4            Q.      Did you like the place?
 5            A.      Yes, it was a good job.
 6            Q.      Good operations and policies from
 7     your knowledge?
 8            A.      Yes.  It was, you know, it was good.
 9            Q.      Pay and benefits pretty good?
10            A.      Yes.  It was reasonable for what I
11     was.
12            Q.      Good people, good managers?
13            A.      Yes.
14            Q.      Would you go back to work there
15     today?
16            MR. ROSS:  Are you offering him his
17            job back?
18            THE WITNESS:  Can I get my seniority
19            back?
20            Q.      (By Mr. Terry)  I am just asking
21     would you?
22            A.      I don't know.  I never thought about
23     it.  Would I get my seniority?
24            Q.      I'm not authorized to offer you your
```

Page 116

1    job back, sir.  I am just getting your feelings on

2    it.

3         A.    I mean, I never thought about it.  I

4    have no bad feelings.  I think I was treated

5    unfairly and I just I --

6         Q.    You worked for Estes for quite a

7    while, correct?

8         A.    Little bit, yes.

9         Q.    And according to your documents and

10   the people I've talked to, you made yourself aware

11   of Estes' policies, rules, procedures, codes and

12   practices, correct?

13        A.    Yes.

14        Q.    Throughout your employment you had

15   signed receipts of acknowledgment and

16   understanding for these policies at various times,

17   right?

18        A.    That is the gray area.

19        Q.    Well, I've got them.  I will show

20   them to you.  Don't you recall you had signed

21   documents that say, "I received this policy and

22   read it and understand it," do you remember those?

23        A.    Yes, I guess.

24        Q.    You generally knew from Estes'

Johnny Will Green, Jr.
November 14, 2013

```
 1        policies -- well, you knew what was an automatic

 2        termination offense, correct?

 3              A.    I really didn't know.

 4              Q.    Let me ask you something.

 5                    Positive on a drug test automatic

 6        firing, correct?

 7              A.    Okay, yes.

 8              Q.    Theft of company automatic firing?

 9              A.    Yes.

10              Q.    Is that right?

11              A.    That I would assume, yes.  I don't

12        remember everything but --

13              Q.    Drugs on company property?

14              A.    Yes, I would say yes to that.

15              Q.    Insubordination, failure to follow

16        directives?

17              A.    Now I would have to say yes.

18              Q.    Falsification of company records and

19        employment related records?

20              A.    Yes.

21              Q.    Violation of the food and poison

22        policy?

23              A.    Yes.

24              Q.    You remember what that was, that
```

CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION
Springfield, MA      Worcester, MA      Boston, MA      Providence, RI

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

1   policy, you can't load poison product with food

2   products on a trailer?

3        A.    Right, yes.

4        Q.    Do you recall in Estes' policy

5   manual that was a policy called -- it was called

6   equal opportunity and harassment in the workplace

7   policy.  Basically it laid down a procedure you

8   could use if you thought that you had been

9   discriminated against or that type of thing.  Do

10   you remember that policy?

11        A.    I think I remember seeing it posted

12   on the facility.

13        Q.    And, also, it was posted on the

14   driver's board.

15        A.    Yes.  I think I remember, yes.

16        Q.    Here is the only question.  The

17   policy, it has the prohibition, then it has the

18   investigations will be done and then it has about

19   five or six ways people can report these types of

20   violations if they believed they happen.  I don't

21   see it anywhere.  I am just asking you for the

22   record.

23            You never did engage that policy or

24   utilize that policy during or after your

Johnny Will Green, Jr.
November 14, 2013

Page 119

1    employment, correct; you never called an employee

2    support line or made a complaint of any sort, did

3    you?

4            A.    No, not that I know of.

5            Q.    In your complaint that you filed

6    here, you state that you received a copy of Estes'

7    code of conduct and the company rules at the time

8    you were hired; is that correct?

9            A.    Yes.

10           Q.    And over the five and a half years

11   you worked with Estes, they would occasionally

12   revise these policies or republish them and you

13   would get those revised policies and handbooks,

14   correct?

15           A.    I would assume.

16           Q.    And I read your papers.  I also

17   talked to your coworkers.

18                 When they would republish these

19   things, Bob Sink would give them out to the

20   drivers, right?

21           A.    He did that particular time.  I

22   don't remember every occasion if how it was done.

23           Q.    Do you remember him giving them to

24   you the times before, too?

Electronically signed by Kristen Edwards (401-299-812-4216)        e196049e-3674-44a6-99dc-864894214a9a

Page 124

1          MR. TERRY:  Can I see that?

2          MR. ROSS:  Yes.

3          MR. TERRY:  Thank you, sir.  I am

4     just trying to figure out what is going on.

5     I have got a third document here, which is

6     called Estes Express Lines Policy Manual

7     that at the bottom right corner has Exhibit

8     11 on it and in parentheses one of seven in

9     parenthesis, which I will mark as Exhibit 6

10    with a blank piece of paper on top of it.

11

12          (Exhibit 6, Estes Express Lines

13          Policy Manual, marked)

14

15          Q.    (By Mr. Terry)  Mr. Green, now what

16    I have -- we will go by these numbers now because

17    I can't get the numbers mixed up with some prior

18    proceedings.

19          A.    I got you.

20          Q.    Okay.  This what I have marked as

21    Exhibit 4, which was your prior Exhibit 2, okay,

22    this is the actual book.

23          A.    That Dan --

24          Q.    Handbook that Dan O'Connor and Bob

Johnny Will Green, Jr.
November 14, 2013

1    Sink gave to you --

2         A.     Bob Sink didn't give it to me.  Dan

3    O'Connor gave it to me.

4         Q.     In June of 2010?

5         A.     Yes.

6         Q.     And it's a complete copy of that

7    entire document, correct?

8         A.     Yes, it should be.

9         Q.     Exhibit 5 for this deposition, which

10   was marked Exhibit 13 at the unemployment hearing

11   --

12        A.     Yes.

13        Q.     -- is another complete handbook,

14   correct?

15        A.     Yes.

16        Q.     That is a 2010 version?

17        A.     Yes, sir.

18        Q.     And where did you get this at?

19        A.     I never got that.  That was --

20        Q.     So how did you get a copy of it?

21        A.     From the unemployment.  I went and

22   got a copy of all the exhibits and information

23   that was --

24        Q.     So Estes gave it to the unemployment

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

Page 131

1    and get all the paperwork for them to send me to

2    show, verify that we weren't the same person

3    because I think we had the same date of birth and

4    our names were similar and it automatically just

5    the way the system is it will kick you off.

6                   MR. TERRY:  Let's go off the record

7          for a minute.

8

9                   (Off record discussion)

10

11                  MR. TERRY:  Back on the record.

12        Q.     (By Mr. Terry)  Sir, I'll remind you

13   you are under oath, okay?

14        A.     Yes.

15        Q.     Any other suspensions, revocations

16   or denial of license other than those two we

17   talked about?

18        A.     No, no, no.

19        Q.     And I know the answer to this, too,

20   but for the record because I've read your

21   complaint at no time prior to today did you have

22   any type of employment contract containing terms

23   or conditions or a duration between you and Estes

24   Express Lines; is that correct?

Electronically signed by Kristen Edwards (401-299-812-4216)              e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 132

1         A.    No.

2         Q.    Am I right?

3         A.    Yes.

4         Q.    You never had a contract signed by

5    the president of the company, correct?

6         A.    No.

7         Q.    You never signed an employment

8    contract, correct?

9         A.    Correct, yes.

10        Q.    There were no verbal contracts of

11   employment from you or by you or with you at

12   Estes, correct?

13        A.    Yes.

14        Q.    You could quit at any time, correct?

15        A.    Yes.

16        Q.    That was your understanding?

17        A.    Yes.

18        Q.    And Estes could let you go at any

19   time and that was your understanding?

20        A.    I don't know.

21        Q.    If you don't know, that's fine.

22        A.    Yes, I don't know.

23        Q.    Bottom line is, do you know what an

24   at-will employee is?

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 133

1     A.     I've learned, yes.

2     Q.     You were an at-will employee with

3  Estes your entire time, correct?

4     A.     Yes.

5     Q.     There was no employment contract?

6     A.     That is what they told me, yes.

7     Q.     And that's the truth, isn't it, to

8  your knowledge?

9     A.     I don't know.

10     Q.     By the way, when you were let go by

11  Estes, you were paid for all your services and

12  work performed prior to the date of your

13  termination, correct?

14     A.     I didn't get my vacation time and

15  stuff, so I would have to say no.

16     Q.     Well, I know what happened there.

17  Tell me if you know this or you -- tell me if you

18  know or don't know.  Estes has a policy that every

19  time somebody hits their anniversary date they

20  give you depending upon how long you have been

21  there X weeks of vacation, right?

22     A.     Yes.

23     Q.     But you have to in that year

24  afterwards you earn it at two or three days a

Page 134

1   month, right?

2          A.     Okay.   They probably do have a

3   system like that, I believe.

4          Q.     But they let people take the

5   vacation any time they want.   So a guy that comes

6   along and hits his anniversary date and he has two

7   weeks of vacation, the next week he can take two

8   weeks of vacation if they will let him off but he

9   actually hasn't earned it.   So what Estes does is

10  if you --

11         A.     Use it.

12         Q.     -- leave after that but you haven't

13  earned it, they get back the vacation they gave

14  you in advance that wasn't earned.

15         A.     Okay.

16         Q.     And that's what they did because you

17  owed 13 hours that you had taken and so they

18  withheld that out of your last pay.

19         A.     Okay, that makes sense.

20         Q.     So putting that aside, as far as

21  your wages worked at the time that you and Estes

22  parted ways, you had been compensated for all your

23  work and services performed by Estes before that;

24  is that correct?

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 135

1          A.      Yes.

2          Q.      Let me talk about this unemployment

3     proceeding that went on there.

4                  Mr. Ross, he wasn't involved in all

5     of that; is that right?

6          A.      No, he wasn't.

7          Q.      That was you and is it Norma?

8          A.      Yes.

9          Q.      And a decision came out in February

10    that granted you unemployment, correct?

11         A.      Yes.

12         Q.      That was February of 2011, right?

13         A.      Yes.

14         Q.      And you read that decision, correct?

15         A.      Yes.

16         Q.      And that decision rules in your

17    favor, right?

18         A.      Yes.

19         Q.      And, basically, that decision

20    contains your version of the facts, correct?

21         A.      Yes, I would have to say yes.

22         Q.      So that decision and your testimony

23    are true and accurate, right?

24         A.      Yes.

Johnny Will Green, Jr.
November 14, 2013

1        Q.      Here are some of the things that

2    were testified to by you and found in the findings

3    of the appeal's hearing officer and just tell me

4    that in this deposition here today that they are

5    true.

6            A.      Okay.

7            Q.      It says that you were aware in June

8    of 2010 of Estes' code of conduct, correct, the

9    rules of employees?

10           A.      Yes, by prior employment.

11           Q.      It's also true that you acknowledge

12   that you refused to sign the handbook receipt

13   given to you in June of 2010 and you also admitted

14   that you understood that was an automatic

15   termination offense under the code of conduct,

16   that's true too, right?

17           A.      Yes.

18           Q.      The referee found and you testified

19   that in June of 2010 you were provided with a

20   handbook, a policy manual by your dispatcher and

21   that the receipt had your name preprinted on it;

22   is that true?

23           A.      I was handed the receipt.  I was

24   never handed a book in the first meeting.  First I

CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION
Springfield, MA      Worcester, MA      Boston, MA      Providence, RI

Johnny Will Green, Jr.
November 14, 2013

Page 137

1    was handed a receipt.

2          Q.     Is that the one that had the

3    preprinting on it?

4          A.     Yes.

5          Q.     And the preprinting was your printed

6    name on the main line above the signature line,

7    correct?

8          A.     It was on the --

9          Q.     Like on Exhibit 7, it would have

10   been --

11         A.     No, it was here.

12         Q.     Oh, okay.  I see what you are

13   saying.  All these acknowledgment forms --

14         A.     They got -- now we got three forms.

15   This is the book he gave me.

16         Q.     Let's look at Exhibit 4 then.

17         A.     So that's the one that --

18         Q.     On Exhibit 4 up at the top, there is

19   a blank that says, I, blank space for a name,

20   hereby acknowledge, et cetera, correct?

21         A.     Yes.

22         Q.     And then at the bottom it has a

23   signature line on the left, a printed name line on

24   the left, a date on the right and a terminal

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 138

1    number and name on the right and the last four

2    digits there is a blank space for that too,

3    correct?

4          A.    Yes.

5          Q.    And what you are saying is the one

6    you got in June of 2010 from Bob Sink?

7          A.    Yes.

8          Q.    Had your name printed up at the top

9    where it says, I, name inserted, hereby

10   acknowledge, correct?

11         A.    Yes.

12         Q.    And that is the one that you struck

13   through and initialed at the top?

14         A.    And dated it.

15         Q.    And dated it?

16         A.    And handed it back in.

17         Q.    Did you hand it back in right then

18   or did you give it to somebody later after you

19   read it?

20         A.    No.  What happened was that when I

21   came in, he handed me the form and I asked him

22   what it was and he was saying something that we

23   needed to sign.  I said, "Well, I'll it look over

24   and I will bring it back."  So, basically, I had

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 139

1    to go make a delivery but I was coming back to the

2    facility so I had enough time to get it back to

3    him so I left --

4              Q.    **Same day?**

5              A.    Same day, yes.  I went out to my

6    delivery, which was probably about an hour or so,

7    came back and then Bob was still at the window and

8    Dan was sitting behind him and I handed it to Bob.

9              Q.    **In the dispatch office?**

10             A.    Yes.  And I handed the piece of

11   paper back to Bob and said, "I can't sign that."

12   And then handed it to me.

13             Q.    **And what you struck out was that top**

14   **blank on the form?**

15             A.    Yes.

16             Q.    **The receipt?**

17             A.    Right.

18             Q.    **I got you.**

19                   **Now, going back to your unemployment**

20   **testimony and the findings by the appeal's hearing**

21   **officer.  We have gone over what your initial --**

22   **what you testified about that.  You testified that**

23   **you didn't recall the prior acknowledgment**

24   **receipts that you had been given having your name**

Johnny Will Green, Jr.
November 14, 2013

1    preprinted at the top like this one was; is that

2    true?

3           A.     Yes.

4           Q.     And that you believed your

5    preprinted name on the top of the receipt meant

6    that you agreed with the terms of the receipt; is

7    that true?

8           A.     Say that again?

9           Q.     I am just going from your testimony

10   and findings.

11                 You believe that because your name

12   was preprinted on the top of the acknowledgment

13   receipt that that meant that you agreed with the

14   terms of the receipt?

15          A.     Yes.

16          Q.     That is the reason you didn't sign

17   it?

18          A.     Yes.

19          Q.     And that is true, right?

20          A.     Yes.

21          Q.     You testified at the hearing that

22   acknowledgment receipt had an at-will contract

23   disclaimer on it, that's true, right?

24          A.     Yes.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

Page 141

1      Q.      You testified that the same at-will

2    and contract disclaimer provision had been

3    contained on the 2007 receipt that you had

4    received; is that correct?

5          A.      Say that one more time.

6          Q.      You testified that the same at-will

7    and contract disclaimer provision was contained on

8    the 2007 receipt that you had signed in 2007; is

9    that correct?

10         A.      I am not sure about -- I am not sure

11   what you meant.

12         Q.      Do you dispute that?

13         A.      You are saying that --

14         Q.      Here is what I am saying.  That the

15   one they gave you in June of 2012 or 2010, okay,

16   it had that language on it.  All this is a

17   contract disclaimer at-will statement, okay?

18         A.      Okay.

19         Q.      They give you one in June 2010,

20   correct?

21         A.      Right.

22         Q.      And you testified at the hearing

23   that this was the same as the one that you had

24   signed back in 2007 when you got a copy of the

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 142

1    handbook; is that true?

2         A.     No.

3         Q.     So that testimony is not true?

4         A.     I don't -- you're saying that I said

5    I already signed one of these in 2007?

6         Q.     For the 2007 handbook, you did sign

7    it but it had the same disclaimer in it.

8         A.     I don't recall.

9         Q.     Do you dispute that or you just

10   don't know?

11        A.     I don't know.

12        Q.     Let me just ask you this.

13               In the receipt that you were given

14   in June of 2010 for the 2010 handbook that had an

15   at-will disclaimer in it, do you know of any

16   difference between that at-will disclaimer and the

17   2010 receipt that you got from the 2007 receipt

18   that you signed or the 2005 receipt that you

19   signed; do you know of any difference in those

20   documents?

21        A.     I don't know, because I would have

22   to compare them.

23        Q.     And you never did?

24        A.     Yes.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

Page 143

1          Q.      And you haven't before today,

2     correct?

3          A.      No.

4          Q.      Going on with our line of questions

5     here.  You testified, "I refused to sign the

6     acknowledgment because I believed I was waiving

7     being an employee because I could be fired any

8     time and for any reason."  Is that true as to the

9     reason you refused to sign it?

10         A.      One of the reasons.

11         Q.      We already talked about the other

12    one or another one, correct?

13         A.      Yes.

14         Q.      And you testified, "I believe if I

15    signed the receipt and got hurt on the job because

16    of this disclaimer the company would not be

17    liable."  Is that the truth as to the reason you

18    didn't sign the receipt in June of 2010?

19         A.      One of.

20         Q.      And you testified that, "Because of

21    the at-will provision, that was an open invitation

22    for Estes to fire me."  Is that true and a real

23    reason why you refused to sign it?

24         A.      One of the reasons.

Johnny Will Green, Jr.
November 14, 2013

Page 144

1        Q.      Well, those are the ones you

2   testified to.  Are those the reasons altogether?

3        A.      Yes.  But, I mean, the fact that the

4   paper said that I was entering into a full, part-

5   time position.

6        Q.      Oh, the contents of that at-will

7   disclaimer that you read that June 2010 day when

8   you were out?

9        A.      Yes.

10       Q.      Is that another reason?

11       A.      Yes, that is a reason.  The fact

12  that someone already handed me a --

13       Q.      Preprinted?

14       A.      -- receipt without the handbook.

15       Q.      Yes, and we got that one.

16               So the bottom line is those are all

17  the reasons and an exhaustive list of the reasons

18  why between June 17, 2010 and June 22, 2010 you

19  refused to sign the handbook acknowledgment

20  receipt, correct?  I mean, you didn't refuse to

21  sign it because you are African-American or

22  because of your age or anything like that.  Those

23  are the reasons, right?

24       A.      Yes.  Some of the reasons, yes.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

Page 145

1      Q.      Those are all the reasons, right; I

2  mean, were you mad; were you trying to get fired

3  on purpose; is there any other reason?

4      A.      No, no, no.

5      Q.      Those are the exhaustive list of

6  reasons, right?

7      A.      Yes.

8      Q.      Again, just to make sure Exhibit 4,

9  which is that one.

10     A.      Yes.

11     Q.      That is the only handbook that you

12  brought to the unemployment.  Estes may have

13  brought some handbooks and receipts but that's the

14  only one you brought as Exhibit 4, right?

15     A.      Yes.

16     Q.      That is the only one to this day

17  that you possess; is that correct?

18     A.      Yes.

19     Q.      Do you have your earlier handbooks?

20     A.      No.

21     Q.      What happened to those; do you

22  remember?

23     A.      I don't know.  I don't have them.

24     Q.      So Exhibit 4 is -- well, for the

Johnny Will Green, Jr.
November 14, 2013

1          A.      I believe so because --

2          Q.      **That is what you told me and told**

3   **the unemployment people.  Exhibit 4 is what Dan**

4   **O'Conner gave you in June of 2010; is that**

5   **correct?**

6          A.      He gave me the book, yes.

7          Q.      **He gave you the book.**

8          A.      This is the thing.  The paper that I

9   crossed my name out and hand it back --

10         Q.      **That was earlier on in June.**

11         A.      Yes, this was in June.  I got the

12  book -- he gave me the book later on that day.  I

13  came back off the delivery.  He gave me the book.

14  The page that they took a copy of that I crossed

15  out, I don't know what revised date was on the --

16  I don't know what it was.  I handed it back, so

17  obviously they have a copy of that page if they

18  handed it.

19         Q.      **You make a good point.**

20                 **The page that they gave you that you**

21  **say was torn out, it was a receipt like page two**

22  **of Exhibit 4, it was like that, right?**

23         A.      It was like that, yes.

24         Q.      **But as far as the revision date on**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 148

1    the bottom of the one you crossed out and gave

2    back to them, you don't know what the date on that

3    was, correct?

4         A.    No.

5         Q.    And you don't have a copy of it,

6    correct?

7         A.    I gave it to them.

8         Q.    And you don't know what they did

9    with it?

10        A.    I don't work in the office.  No, I

11   don't.

12        Q.    But the one, the book that they gave

13   you, that Dan gave you is Exhibit 4?

14        A.    Yes, sir.

15        Q.    And so here in June of 2010 when

16   there are supposed to be new handbooks being given

17   out, right?

18        A.    Right.

19        Q.    Dan O'Connor gives you a 2007

20   handbook?

21        A.    Yes.

22        Q.    With a 2007 receipt in it, with a

23   2007 receipt in it; is that correct?

24        A.    Yes.

Page 151

1    disclaimer with any of your coworkers in June of

2    2010?

3         A.    I don't remember.

4         Q.    Let me go through some sets of

5    events and these, again, are based on your

6    documents or what you just told me what you

7    clarified.

8               By the way, your start time was

9    around one p.m., is that correct?

10        A.    It varied, because I would call in.

11   It depended on what was needed.

12        Q.    Normal was it one?

13        A.    I would say normal, yes, eleven or

14   one or something.

15        Q.    On that Friday -- actually, I think

16   it was June 18th.  We have been saying 17 but I

17   think it was the 18th -- you were working that day

18   and you showed up shortly before one p.m., which

19   was your start time on that particular day; is

20   that correct?

21        A.    Yes.

22        Q.    And you had one of the later start

23   times.  Other P and D drivers would come through

24   earlier and go out there in the morning, correct?

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 152

1          A.     Yes.

2          Q.     And did you see Bob handing out the

3     handbooks that morning to anybody else?

4          A.     Never handed out anything.  I never

5     seen him do anything.

6          Q.     But according to you, you walked up

7     to the dispatch window and Bob handed you a

8     detached handbook receipt, correct?

9          A.     I don't know if it was detached from

10    the handbook or not.  It looked like it was a

11    copy.

12         Q.     Was it attached to the handbook?

13         A.     No, there was no handbook involved.

14         Q.     It was not attached to the handbook?

15         A.     No.

16         Q.     This is the one that had the

17    preprinted name on it?

18         A.     Yes.

19         Q.     He told you to look that over and

20    sign it?

21         A.     Yes, and hand it.

22         Q.     And then you go out, you take the

23    form and you don't know what revision date it was,

24    correct?

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 153

1        A.      No, no.

2        Q.      Is that a yes; you don't know what

3   the revision date was on the form?

4        A.      I don't remember.

5        Q.      You go out and you make a pedal run.

6   It takes you an hour, give or take.  You look over

7   the document.  You come back and you decide that

8   you do not like it because it has your name

9   preprinted at the top, correct?

10        A.      I felt uncomfortable with it so yes.

11        Q.      So you struck out your name, a line

12   through it, initialed it and dated it, came back

13   in off your run, go up to the dispatch window.

14   Bob Sink is at the dispatch window.  Dan O'Connor

15   is back behind doing whatever he is doing.

16        A.      Yes.

17        Q.      And you hand it back to him, to Bob

18   and say, "I'm not comfortable signing this"?

19        A.      Yes.

20        Q.      And then after that is when Bob

21   takes you into Dan's office where you meet with

22   Dan and Bob; is that correct?

23        A.      No, Bob never --

24        Q.      Or did he tell you to go see Dan?

Page 154

1        A.        Actually, what happened was Bob

2    related to Dan that I wasn't signing because he

3    was sitting behind him and then Dan asked me why

4    not.  I told him that I was uncomfortable with it.

5    And, basically, he said, "Well, what if I send you

6    home?"  I said, "Well, do what you have to do."

7    He looked displeased and he got up and walked into

8    his office.

9              Basically, I was still standing at

10   the dispatch window for about maybe seven to ten

11   minutes and Bob had returned and says, "Well,

12   there's no sense in me having you standing here.

13   I might as well send you back to work."

14              So he then gave me another

15   assignment, sent me back out.  As I was going out

16   to hook up to my trailer, they told the yard

17   jockey that Dan wanted to see me inside.

18        Q.        **That is when you ended up in Dan's**

19   **office?**

20        A.        Yes.  I just wanted to get it right.

21        Q.        **Tell me if this is what happened in**

22   **that meeting.  They brought you in.  They told**

23   **you, "Johnny, just go ahead and sign it.  It's no**

24   **big deal," to which you responded, "Dan, I told**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 155

1    you I'm not comfortable signing that form," is

2    that accurate?

3          A.    When I went in, yes.  I wouldn't say

4    it's 100 percent accurate.

5          Q.    I am going to get to the rest of it.

6    I am going through it sequentially.

7          A.    Yes.  He was like everybody signed

8    or whatever the excuse was.

9          Q.    And do you recall telling Dan, "Dan,

10   I can get fired at any time," at which time you

11   say, "Can I see the original receipt that I signed

12   when I was hired?"  And Dan says, "Maybe that is

13   somewhere on file somewhere," is that accurate;

14   was that said?

15         A.    I didn't say anything about being

16   fired.

17         Q.    No, Dan said -- oh, you said that?

18         A.    I didn't say anything about getting

19   fired.  I think the conversation --

20         Q.    Go ahead.

21         A.    I went in the office and we sat down

22   and he basically said, you know, I have been a

23   little late getting the paperwork and stuff out or

24   whatever.  And he says, you know, he asked me why

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Page 156

1    I wouldn't say.  I said, "I felt uncomfortable."

2    I explained someone printed my name for

3    acknowledgment and it was stated that I was

4    entering into a full or part-time position and

5    that that acknowledged the fact that I had a book

6    that he didn't give me.

7              And I was like -- and he was like,

8    "Well, everybody has signed one of these forms one

9    time or another."  And I said, "Well, where is my

10   original one?"  And he looked blank in the face

11   and was like, "Which one, the one when you

12   started?"  I said, "Yes, I guess."  And then he

13   just --

14        **Q.    At some point he handed you Exhibit**

15   **4, didn't he?**

16        A.    Yes.  He handed me Exhibit 4 after

17   that conversation went on.  He says, well, I

18   really don't know what to do.  So what I am going

19   to do is send you back to work.  I am going to

20   check with probably H and R I assume, so I went

21   back on another run.

22        **Q.    And he gave you Exhibit 4 to take**

23   **with you?**

24        A.    No.

Page 157

1          Q.       That was when you came back?

2          A.       When I came back.  When I came back,

3    I seen him again.  I seen him that day again and

4    that is when he brought me in.  And prior to the

5    first conversation, I said, "Where is the book?"

6    He says, "We don't have any.  We don't have any

7    books."  He says, "Either they are" -- I don't

8    know what he said, you know, whatever, whatever.

9          Q.       Well, don't guess.  Just tell me

10   what you do know.

11         A.       I remember him saying he just had

12   the paper and he said he didn't have it or

13   whatever.  So he says, "Just come back.  Go out on

14   your run and come back."  And when I came back, he

15   came up with that book and gave me that book.

16         Q.       Which is Exhibit 4?

17         A.       Right.  And then he told me to take

18   the book and look it over.

19         Q.       Over the weekend?

20         A.       Right.

21         Q.       You were not scheduled to work until

22   next Tuesday, the 22nd?

23         A.       I am not sure what day it was.  I

24   think it was he wasn't going to be around until

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 158

1    Tuesday.  I am not sure but either way he had --

2    we knew that we were going to meet on Tuesday.

3         Q.      Because he gave you Exhibit 4, told

4    you to take it home over the weekend while you are

5    off, look over it, read it, come back next week on

6    Tuesday, which would have been June the 22nd, and

7    give me an answer one way or another whether you

8    are going to sign it and check with me before you

9    punch in and you said, "Okay.  I will see you next

10   Tuesday."  Does that sound accurate?

11        A.      Yes.

12        Q.      So the bottom line is Dan -- the

13   only handbook you were given in June of 2010 is

14   Exhibit 4, which is a handbook and an

15   acknowledgment receipt both of which are from

16   2007; is that correct?

17        A.      Yes.

18        Q.      And you don't know that on that

19   Friday who Bob or Dan or anybody would have talked

20   to in HR, do you?

21        A.      No.

22        Q.      Did you go home that weekend and

23   look over Exhibit 4 that had been given to you?

24        A.      Yes.

Johnny Will Green, Jr.
November 14, 2013

Page 159

1          Q.     And were you able -- it has an

2     at-will disclaimer clause on the first page after

3     the cover, correct?

4          A.     Yes.

5          Q.     It's also the last page before the

6     back cover is an at-will disclaimer clause,

7     correct?

8          A.     Yes.

9          Q.     And, also, there is a receipt for

10    the code of conduct which has a contract

11    disclaimer form in it, correct?

12         A.     Yes.

13         Q.     And the fourth and final disclaimer

14    is after the EEO policy that I mentioned to you

15    earlier that expressly disclaims an expressed or

16    implied contract, correct?

17         A.     Yes.

18         Q.     And here is what I am asking you

19    about.  It has four disclaimers in here in the

20    employment contracts stating that this at-will --

21    did you take this book, number four, that you had

22    over that weekend in June of 2010 and compare

23    these disclaimers to any other contract

24    disclaimers in any other handbooks?

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Page 160

1          A.     No, I didn't have any.

2          Q.     So you don't know if they could have

3    been exactly the same or different; is that

4    correct?

5          A.     Yes, I don't know.

6                 Could I use the bathroom?

7          Q.     You betcha.

8                 MR. TERRY:  Off the record.

9

10                (A recess was taken)

11

12                MR. TERRY:  Back on the record.

13          Q.     (By Mr. Terry)  Mr. Green, sir, for

14    the record, you are reminded you are under oath,

15    okay?

16          A.     Yes.

17          Q.     Let's go to Tuesday, June 22, 2010.

18    You came in back to work and you had Exhibit 4

19    with you shortly before 1:00 on that day; is that

20    correct?

21          A.     Yes.  I believe so, yes.

22          Q.     And, again, you had a meeting with

23    Dan that day; isn't that correct?

24          A.     Yes.

Johnny Will Green, Jr.
November 14, 2013

Page 161

1      Q.     And Mark Kato was in that particular

2   meeting, was he not?

3      A.     Yes, he was.

4      Q.     Do you know whether or not -- do you

5   know who they talked to over the weekend?

6      A.     No.

7      Q.     They being the terminal managers or

8   anybody?

9      A.     No.

10     Q.     With HR or anybody?

11     A.     No, I don't.

12     Q.     Do you know whether or not they tape

13  recorded the conversation they had with you?

14     A.     No.

15     Q.     Tell me if this is accurate.

16            You get in the meeting and Dan asked

17  you whether or not you'd reconsidered signing the

18  handbook.  Said that he had called Renee Bloom,

19  who is the regional HR manager, and confirmed that

20  if you refused to sign it, it was insubordination

21  under the code of conduct and you could be fired.

22  Do you remember him starting off the conversation

23  that way?

24     A.     Yes, something to that effect.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

Page 162

1    Q.      And you stated, "I don't care, Dan.

2  I feel like the original form I signed when I was

3  hired was enough."  Does that sound accurate?

4    A.      No.

5    Q.      What did you say?

6    A.      I told him I still felt

7  uncomfortable signing it, and that I couldn't sign

8  it.

9    Q.      What was said then?

10    A.      I guess he made a second offer like

11  you --

12    Q.      Please sign it?

13    A.      Saying I will give you a second

14  chance basically and I said, "I am going to have

15  to stand my ground because I'm not comfortable

16  with it."  And then he basically terminated me.

17    Q.      Do you remember before he terminated

18  you he excused you from the room, called HR again,

19  you and Kato were standing out in the hall?

20    A.      No, I don't recall that.

21    Q.      Is it possible or do you know?

22    A.      I don't know.

23    Q.      Here is the reason I say it.  Kato

24  says that Dan excused you from the room and he

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
Springfield, MA     Worcester, MA     Boston, MA     Providence, RI

Johnny Will Green, Jr.
November 14, 2013

1    called HR again to make sure he was doing the

2    right thing and that you and Kato were standing

3    out in the hall.  This is what Mark Kato says.

4    And Mark says, "Johnny, just go ahead and sign the

5    thing."

6             And you stated, "Well, they can fire

7    me but I don't like the wording on it."  And then

8    Mark said, "Well, they won't fire you without a

9    reason.  And you said, "Well, I still am

10   uncomfortable with the language."

11            Do you remember that happening?

12       A.    No.

13       Q.    Is it possible or you don't remember

14   or you don't think it happened?

15       A.    No.  I don't think that happened

16   because all I remember is I came into work and we

17   only went in the office one time, all three of us.

18   He asked Mark to come in.  I don't remember

19   exiting out of the office or to exit me off the

20   premises.

21       Q.    During this whole meeting, you were

22   respectful and cordial with them, correct?

23       A.    Yes.

24       Q.    Even when you all went out to get

Johnny Will Green, Jr.
November 14, 2013

Page 164

1    your personal belongings?

2              A.    Yes.

3              Q.    And they were with you too, correct?

4              A.    Yes.

5              Q.    And what you've just gone over, that

6    is all that was said that you can recall or that

7    you have any evidence on June 22, 2010; is that

8    correct?

9              A.    Yes.

10             Q.    Did you tell any of your coworkers,

11   make this statement to them, "Now I can get my own

12   truck"?

13             A.    No.

14             Q.    Did you tell anybody about your

15   termination, "Well, that is fine with me.  I will

16   just go home and sit on the couch and call

17   unemployment"?

18             A.    No.

19             Q.    I don't know if you know this or not

20   and if you don't, just say I don't know one way or

21   the other.

22             A.    Okay.

23             Q.    In this mid-June 2010 when these

24   events we just talked to you about on this Exhibit

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Page 165

1    4 were going on, are you aware that the terminal

2    there in Chicopee was mistakenly giving out 2007

3    handbooks and receipts rather than the new 2010 to

4    all the employees; did you know that?

5          A.     No.

6          Q.     Has anybody told you that since you

7    left?

8          A.     No.

9          Q.     Has anybody told you that about two

10   months after you were gone somebody in Richmond

11   figured out that they had given out the wrong

12   handbooks, specifically given out 2007 handbooks

13   in 2010 and they had to go back and give everybody

14   2010 handbooks and receipts in August of 2010; do

15   you know that?

16         A.     No.

17         Q.     Nobody has told you that?

18         A.     No one.  I mean, no one has told me

19   that information.  That was not -- we were in

20   Springfield.  We were not in Chicopee.

21         Q.     I keep saying --

22         A.     I want to make sure we are at the

23   same place.

24         Q.     So you didn't know anything -- you

Johnny Will Green, Jr.
November 14, 2013

Page 166

1    can't dispute that that didn't happen.  You just

2    don't know it, correct?

3         A.    No.

4         Q.    Am I right?

5         A.    Yes.

6         Q.    I just have to show you some

7    documents that I have to put on the record, sir,

8    so let me go ahead and plow through this.  Let me

9    hang on to this because I have to make copies.

10

11              (Exhibit 8, acknowledgment form,

12              marked)

13

14         Q.    Let me show you what is marked

15   Exhibit 8 to your deposition, which is a handbook

16   acknowledgment form dated January 26, 2006 and let

17   me ask you to look at that, sir.  Is that your

18   signature on the bottom of that?

19         A.    I don't know.

20         Q.    This is the one you signed when you

21   first got hired or shortly after you got hired,

22   the first handbook you got.  Is that your

23   signature?

24         A.    Doesn't say Johnny W. Green, Jr. on

Johnny Will Green, Jr.
November 14, 2013

Page 167

1    it.

2            Q.      You don't know if it is or not?

3            A.      Yes, I don't know.  Is that a copy?

4            Q.      It's a copy of what is in your file.

5    The date is January 26, 2006, right; is that

6    right?

7            A.      Yes, that is what it says.

8            Q.      On this particular handbook receipt,

9    right?

10           Now, let me show you what I will

11   mark as Exhibit 9 to your deposition.

12

13           (Exhibit 9, handbook receipt,

14           marked)

15

16           Q.      This is a handbook receipt dated

17   May 15, 2008.  Is that your signature on the

18   bottom of that?

19           A.      I don't know.  That says 2007.

20           Q.      Well, it's the 2007 revision of the

21   handbook that shows you signing for it in May of

22   2008 when they gave you the copy, you remember

23   that?

24           A.      I don't remember.

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

1        Q.       But you don't dispute it.  You just

2    don't remember, right?

3        A.       Right.

4        Q.       Let me show you what I will mark as

5    Exhibit 10.

6

7                 (Exhibit 10, receipt, marked)

8

9        Q.       And for the record, the handbooks

10   that Estes had that would have a receipt on the

11   first page for the entire handbook but they also

12   have receipts in the earlier versions for the code

13   of conduct and the EEO harassment policy also so

14   when you get a handbook, you'd actually sign three

15   receipts; do you recall that one way or the other?

16       A.       I guess if it's in the book.

17       Q.       Well, it's in the book you gave us

18   Exhibit 4, Exhibit 4, that is the code of conduct

19   receipt dated 1/15/04.  That is when you first

20   came with the company, right?

21       A.       Yes, '04.

22       Q.       That is Exhibit 10.  And then

23   Exhibit 11, that looks like the same thing.

24   Exhibit 11 is a code of conduct receipt that you

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

Page 169

1    got for the handbook 2005 version, correct?

2            A.      Looks like it.

3

4                    (Exhibit 11, receipt, marked)

5

6            Q.      And Exhibit 12, that is a handbook

7    receipt when you got the 2007 handbook; is that

8    correct?

9            A.      I don't recall getting a handbook.

10   So, I mean, any of these handbooks -- I mean, my

11   name is there so my signature is not full.

12           Q.      But you don't dispute that you

13   singed for these.  You just don't recall; is that

14   right?

15           A.      Yes, I don't recall.

16

17                   (Exhibits 12 and 13, receipts,

18                   marked)

19

20           Q.      Exhibit 13, you know we talked about

21   the code of conduct being inside the handbook.

22   This is the EEO harassment policy inside the

23   handbook.  That is a receipt marked Exhibit 13 to

24   your deposition for that policy contained in the

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1    handbook, correct; is that correct?

2         A.    Yes.

3         Q.    The last one I need to put on the

4    record is the EEO policy receipt that was

5    contained in the '07 handbook, which I will mark

6    Exhibit 14.   That is what that is; is that

7    correct?

8         A.    Yes.

9

10             (Exhibit 14, receipt, marked)

11

12        A.    Can I ask you a question?

13        Q.    Yes, hang on just a second.  I don't

14   want to lose my count here.   I am getting

15   confused.

16        A.    There is a date on here that says,

17   date says 2004 for the code of conduct and all

18   that paperwork.

19        Q.    Back at that time, they were handing

20   out the code of conduct separately outside the

21   book.   It was signed for separately.

22        A.    And then the date for the other

23   acknowledgment form, does it say 2006 or why is it

24   not the same date?

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 171

1          Q.     What they would do on occasion is
2     they -- on occasion they would republish the whole
3     book.  On other occasions they would republish
4     policies in the book and rather than print the
5     whole book, like if they change the code of
6     conduct, they'd get you to sign a receipt for the
7     code of conduct.  You don't remember one way or
8     another though?
9          A.     No.
10          Q.     What would you do with these papers
11     when they'd give them to you?
12          A.     I don't know.  I'd take them home,
13     store them in my information for whatever.
14          Q.     Do you still have them?
15          A.     No.
16          Q.     Have you looked for them?
17          A.     Yes.
18          Q.     I have some policy handbooks here.
19     Let me show you what I will mark as Exhibit 15.
20     And for the record, this is the April 19, 2005
21     handbook, which was right after you got hired,
22     okay?
23          A.     Okay.
24

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 172

1              (Exhibit 15, April 19, 2005

2              handbook, marked)

3

4         Q.      Showing you what's marked Exhibit

5    15.  This is the one you signed for this Exhibit

6    15 on your receipt marked Exhibit 8, which you got

7    January of '06; is that correct?

8         A.      I don't recall signing for it.

9         Q.      You don't dispute it.  You just

10   don't remember, right?

11        A.      Right.

12              MR. ROSS:  He doesn't dispute that

13        he signed it.  I think what he is trying to

14        say, too, is he is not sure whether he got

15        a copy of the policy manual or whether it

16        was similar to what happened to him.

17              THE WITNESS:  That day.

18        Q.      (By Mr. Terry)  You don't remember

19   one way or the other?

20        A.      No.

21

22              (Exhibit 16, July 7, 2007 handbook,

23              marked)

24

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

Page  173

1          Q.       Let me show you Exhibit 16.   This is

2     the July 7, 2007 revision.   Again, one way or the

3     other, do you remember getting that or not ever?

4          A.       Yes, I got this from Dan O'Connor.

5     This is the book that I brought.

6          Q.       But it's also the one you signed for

7     a receipt for back in May 15, 2008.   Do you recall

8     whether or not you got the book or not?

9          A.       I don't recall getting the book.

10          Q.       What you do know about Exhibit 16 --

11     well, you don't -- whether or not you don't

12     remember getting it back in May of 2008 the year

13     2007 revised handbook, the only thing you do know

14     for sure is that a copy of Exhibit 16, which is

15     the 2007 handbook, was given to you by mistake by

16     Dan in your meeting with him on June 22nd,

17     correct?

18                    MR. ROSS:   2010.

19                    THE WITNESS:  Yes, 2010.   I don't

20          know who was at mistake or not.

21

22                    (Exhibit 17, February 2010 handbook,

23          marked)

24

Johnny Will Green, Jr.
November 14, 2013

Page 174

```
 1          Q.      (By Mr. Terry)  Let me show you what
 2     I will mark Exhibit 17 to your deposition.  This
 3     is the February 2010, the one you should have
 4     gotten in June.
 5          A.      Okay.
 6          Q.      That is marked Exhibit 17.  You've
 7     never seen that, correct, except at the
 8     unemployment hearing?
 9          A.      Yes, correct, at the unemployment is
10     the first time I seen it.
11          Q.      You didn't see it back in June or
12     any time before that in 2010, am I right?
13          A.      Yes.
14          Q.      Let me ask you this.  Exhibits 14 --
15     strike that.
16                  Exhibits 8 through 14, which are
17     these signed receipts by you for the handbook, the
18     code of conduct and the EEO policy, they all have
19     disclaimers, employment contract disclaimers
20     at-will provisions in them, correct?
21          A.      Yes.  From what I can see, yes.
22          Q.      And the policy manuals I have shown
23     you republished or revised in 2005, 2007 and 2010,
24     they, too, have contract disclaimer, at-will
```

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 175

1    provisions in all of them too, correct?

2          A.    Yes.

3          Q.    And as we sit here today, I've read

4    them word for word.  They are all identical from

5    2005 through 2010 or can you say one way or the

6    other?

7          A.    I don't believe so.

8                MR. ROSS:  Are you talking about the

9          whole policy and procedures or the

10         acknowledgment?

11               MR. TERRY:  Well, the

12         acknowledgments are all the same.  They say

13         the same thing, that there is no expressed

14         or implied contract of employment.  I mean,

15         we can go through it on the record.

16               MR. ROSS:  No.  I mean, I don't know

17         if it's exactly the same language or not.

18               MR. TERRY:  Actually, it is.

19               MR. ROSS:  All the policies are

20         exactly the same, too?

21               MR. TERRY:  Yes.

22         Q.    (By Mr. Terry)  I will show them to

23    you.  Let's do this on the record here.

24               We've got Exhibit 15, the 2005

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA     Worcester, MA     Boston, MA     Providence, RI**

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 179

1   reason with or without cause or notice.

2           That language in the '07 has been

3   added to the bold printed language in the '05,

4   which basically is explaining in layman's terms,

5   easy to understand terms what at-will means.  But,

6   otherwise, they both are the same; is that

7   correct?

8           A.     No.

9           Q.     What else is different?

10          A.     Because even here it says revised

11  in, like, to this manual and employees policies.

12          Q.     Okay.  That has nothing to do with

13  the disclaimer but what are you talking about?

14          A.     You are asking me are they the same.

15  They don't look the same to me.  They don't say

16  the same thing.

17          Q.     The contract disclaimers say the

18  same thing though, don't they?

19          A.     I don't know.  I'd have to really

20  take my time and look over it.  I don't know.

21          Q.     Let me just tell you this.  Both

22  these documents, the '05 and the '07 make it clear

23  that you are -- the employees are at-will and

24  there is no contract unless signed by the

Electronically signed by Kristen Edwards (401-299-812-4216)              e196049e-3674-44a6-99dc-864894214a9a

Page 180

1    president, correct; that is what they say,

2    correct?

3          A.     If that is what you are telling me,

4    I guess, yes.

5          Q.     Do you dispute that?

6          A.     I believe that is what it says.

7          Q.     And the bottom line is, the 2010,

8    which you never got, says the exact same thing,

9    correct?

10         A.     I don't know.  I didn't --

11         Q.     Read it right now.  You tell me.

12   It's the bold print section right there.

13              MR. ROSS:  He never got this

14         document.

15              THE WITNESS:  I never got it.

16              MR. TERRY:  I know.  I am asking him

17         for the record, because there is no change

18         between them.

19              THE WITNESS:  I can't say there is

20         any change because I really don't

21         understand -- you know, if I see

22         different -- like this, I mean, we could be

23         here all day trying to figure this out but

24         I never got this so I can't say to you

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 182

1          A.    No.

2          Q.    Show me what is different between

3    them in the bold printed contract disclaimer

4    provision.

5          A.    I would have to look it over.

6          Q.    Take your time.

7          MR. TERRY:  We will go off the

8    record.

9

10              (A recess was taken)

11

12          MR. TERRY:  Back on the record.

13          Q.    (By Mr. Terry)  You are looking at

14   Exhibit 16, which is the '07, and Exhibit 17,

15   which is the '10 handbook.  I only need you to

16   look at the bold printed contract disclaimer

17   language and tell me if there are any differences.

18          A.    They appear to be the same.

19          Q.    The bottom line is when you look at

20   all three of the handbooks, Exhibit 15, 16 and 17

21   from '05, '07 and '10, they all make it clear that

22   your relationship with Estes is at-will, correct?

23          A.    Yes.

24          Q.    That you have no contract unless the

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1    president signs a contract with you, correct?

2              A.    Yes.

3              Q.    And you didn't have a signed

4    contract with Rob Estes, correct?

5              A.    Not that I recall, no.

6              Q.    And that you could quit at any time

7    and they could let you go at any time; is what it

8    says, right?

9              A.    Yes.

10             Q.    And that never changed ever from the

11   date that you were hired to the dates that you

12   left, is that correct, to your knowledge?

13             A.    I guess not.

14             Q.    Do you know of anybody else that's

15   ever refused to sign a writeup?  I mean, strike

16   that.

17                   That's refused to sign a handbook

18   receipt or a policy receipt or a writeup, written

19   discipline; do you know of anybody that has done

20   that and not been terminated?

21             A.    I don't know.

22             Q.    And let me just ask you this.

23                   Had you signed the receipt, whether

24   it was the right or wrong handbook, in June of

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

Page 184

1    2007; had you just simply signed it like all the

2    other employees, you would still be working there

3    for all intents and purposes, agreed?

4         A.    I don't know.

5         Q.    You don't know one way or the other?

6         A.    I don't know.  I can't say.

7         Q.    From all you know and all you saw

8    and people that you worked with, who, by the way,

9    like you out there still.

10        A.    Yes.

11        Q.    But from all your knowledge,

12   evidence and belief, no one who was involved in

13   this situation had any malice or fraud or ill will

14   towards you as a motive; is that correct?

15        A.    No, not that I know of.

16        Q.    None that you know of, right?

17        A.    No.

18        Q.    Right?

19        A.    Right.  Can I say one thing?  In

20   these policy books, even I think my attorney went

21   over with me before that, there was some

22   information in one book that wasn't in the other

23   as far as --

24        Q.    Yes, they changed the policies in

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Electronically signed by Kristen Edwards (401-299-812-4216)                    e196049e-3674-44a6-99dc-864894214a9a

Page 185

1     there.

2              A.      Okay.

3              Q.      Like new laws come out, and they

4     have to add things in it.  That is why they

5     republish it.  There are two reasons to put it

6     back out, number one, it's been a little while and

7     they want to make sure they are out in the field;

8     and, number two, the policies have changed and

9     what have you.  I mean, you don't dispute that.

10    You just don't know why they put them out.

11             A.      Excuse me, what do you mean?

12             Q.      What I just said do you know whether

13    that is right or wrong; you don't dispute that, do

14    you?

15             A.      Do I dispute that fact it's right or

16    wrong?

17             Q.      I just explained to you when they

18    put them out, okay?

19             A.      Mm-hmm.

20             Q.      Do you disagree with that or do you

21    just not know that that's the reason they put them

22    out when they do?

23             A.      No, I didn't know.

24             Q.      From what you saw back there in June

Johnny Will Green, Jr.
November 14, 2013

Page 186

1  when all of this was going on, did you see anybody

2  doing anything that you thought was intentionally

3  done in bad faith towards you?

4          A.    No.

5          Q.    You've worked at other places here

6  in Massachusetts, haven't you, obviously besides

7  Estes, right?

8          A.    Yes.

9          Q.    Do all of them give you handbooks

10  and policy manuals?

11          A.    I believe so.  I mean --

12          Q.    Here is what I am getting at.

13                Are you aware of the fact that a

14  company doesn't have to even provide policies in

15  written form, that they don't have to put out or

16  publish a handbook?

17          A.    No.

18          Q.    Do you know one way or the other?

19          A.    No, I don't.

20          Q.    And this whole ordeal that we went

21  through in June of 2010 with the handbook, did

22  anybody ever lie to you, to your knowledge, or did

23  you lie to anybody?

24          A.    No.

Electronically signed by Kristen Edwards (401-299-812-4216)          e196049e-3674-44a6-99dc-864894214a9a

Johnny Will Green, Jr.
November 14, 2013

1      Q.      During this entire ordeal back in

2   June 2011, did anybody tell you to do something

3   that was a crime or illegal?

4      A.      No.

5      Q.      We are getting close.

6              Let me ask you this, Mr. Green.  Do

7   you see the box that they were kind of in back

8   then?

9      A.      Meaning who?

10     Q.      Let me explain it further.

11             You've got the supervisors at the

12  terminal.  We have somebody who is not signing a

13  handbook receipt when told do so and I know you

14  had reasons in your mind being comfortable with it

15  but you're clearly refusing to do something they

16  are asking you, correct?

17     A.      Yes.

18     Q.      And that is a termination offense

19  under Estes policy, correct?

20     A.      Yes.

21     Q.      And so they are kind of in a box

22  that they had to do this if you continued to

23  refuse.  You understand that in order to

24  consistently apply their policies because somebody

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

Johnny Will Green, Jr.
November 14, 2013

1    comes by later, they give him a writeup for

2    something and he refuses to sign it, well, their

3    policy is he gets terminated.

4                But if they don't terminate you and

5    some guy that comes back that is 60 years old, he

6    sues them for age discrimination, they fire him

7    and they don't fire you, do you see why they have

8    to comply consistently?

9         A.    I don't really understand.  I just

10    felt that they were asking me to do something that

11    I wasn't uncomfortable with.

12         Q.    That is fine.

13                Let me ask you this then.  If they

14    would have given you just a written reprimand

15    rather than terminated, you would be here today;

16    would that have been fair in your mind?

17         A.    I don't know.  What do you mean by

18    written?

19         Q.    If they just wrote you up for

20    refusing to sign the document rather than let you

21    go, would that have been fair in your mind a

22    lesser form of discipline?

23         A.    Possibly.

24         Q.    Do you know what you want?  I am not

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
Springfield, MA     Worcester, MA     Boston, MA     Providence, RI

Johnny Will Green, Jr.
November 14, 2013

Page 205

1          Q.     These are normal questions, again,

2    not to offend but I have to ask it at the end.

3                 Are you the kind of person that

4    would lie under oath?

5          A.     No.

6          Q.     Would you lie to get money?

7          A.     No.

8          Q.     Would you lie to get a job?

9          A.     No.

10         Q.     Would you lie to an employer?

11         A.     No.

12         Q.     Would you lie to a perspective

13   employer?

14         A.     No.

15         Q.     Have you told me the truth here

16   today under oath?

17         A.     Yes, I did.

18         Q.     Subject to the penalties of perjury,

19   correct?

20         A.     Yes.

21         Q.     Have you hidden anything,

22   misrepresented anything, exaggerated anything,

23   twisted the truth, lied in any way?

24         A.     No.

**Johnny Will Green, Jr.**
**November 14, 2013**

Page 206

```
 1          Q.      So what you've given me here is the
 2   complete truth, correct?
 3          A.      To the best of my knowledge, yes.
 4          Q.      There's nothing in this world that
 5   would cause you to change this testimony today
 6   because you understood my questions and you
 7   answered them truthfully and accurately and
 8   completely; is that correct?
 9          A.      Yes.
10          Q.      Last thing.  We are in a lawsuit
11   today.  We are on opposite sides of a table, okay?
12          A.      Okay.
13          Q.      But, nonetheless, given that we
14   don't -- we are opposed to things, have I treated
15   you like a gentleman and with cordiality?
16          A.      Yes, sir.
17          Q.      Thank you and you have, too.  I will
18   say that for the record.
19          A.      Thank you.
20          MR. TERRY:  I will put on the record
21          that we probably need to adjourn, although
22          chances of coming back are slim because
23          we've got some discovery we need to look
24          at.  And if we need to, Mr. Ross has been
```

**CATUOGNO COURT REPORTING & STENTEL TRANSCRIPTION**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**